**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: SUBPOENA TO THE ASHCROFT LAW FIRM | Case No. _____ |

| | |
|---|---|
| ROBERT BARTLETT, et al.<br><br>               Plaintiffs,<br>v.<br><br>SOCIÉTÉ GÉNÉRALE DE BANQUE AU LIBAN, SAL, et al.<br><br>               Defendants. | No. 19-cv-00007 (CBA) (TAM)<br>[pending in the U.S. District Court for the Eastern District of New York] |

**ASHCROFT LAW FIRM LLC'S MEMORANDUM IN SUPPORT OF  MOTION TO QUASH NON-PARTY SUBPOENA AND FOR PROTECTIVE ORDER**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I.      RELEVANT FACTUAL BACKGROUND ................................................................. 2

        A.  Ashcroft's Representation of SGBL from 2011 to the Present ..................... 2

        B.  Pleadings and Motion Practice in the EDNY Litigation ............................... 3

        C.  Discovery in EDNY Litigation ..................................................................... 6

        D.  Plaintiffs' Subpoenas to Non-Party Ashcroft .............................................. 8

        E.  Plaintiffs' Abusive Discovery Efforts Against Non-Parties ......................... 9

        F.  Plaintiffs' Attempt to Misuse Discovery Obtained in EDNY Litigation ................... 10

II.     ARGUMENT ........................................................................................................ 13

        A.  Plaintiffs' Subpoena Must Be Quashed Because It Is Overbroad and Subjects
            Non-Party Ashcroft to an Undue Burden .................................................. 15

        B.  The Subpoena Must Be Quashed Because It Was Issued for an Improper
            Purpose ...................................................................................................... 18

        C.  The Subpoena Must Be Quashed Because It Seeks Information That
            Can Be Requested from the Relevant Governmental Entities or Parties .................. 19

        D.  Ashcroft Should Recover Its Attorney's Fees ........................................... 20

*Conclusion* ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Bartlett v. Société Générale de Banque au Liban SAL*,
   No. 19CV00007CBAVMS, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .............4, 6, 7

*Bartlett v. Société Générale de Banque au Liban SAL*,
   No. 19-CV-7, 2023 WL 2734641 (E.D.N.Y. Mar. 31, 2023) ............................. 6, 7, 8, 15

*Bartlett, et al. v. TAG Holdings, LLC*,
   Case No. 1:22-mc-00130 (D.D.C.) ................................................................................. 9

*Bio-Vita, Ltd. v. Biopure Corp.*,
   138 F.R.D. 13 (D. Mass. 1991) .....................................................................................14

*Bogosian v. Woloohojian Realty Corp.*,
   323 F.3d 55 (1st Cir. 2003) ...........................................................................................15

*Bowman v. HSBC Holdings plc*,
   No. 19-cv-2146-PKC-CLP (E.D.N.Y.) ..........................................................................11

*Colonial Gas Co. v. Aetna Cas. & Sur. Co.*,
   139 F.R.D. 269 (D. Mass. 1991) ...................................................................................17

*Cusumano v. Microsoft Corp.*,
   162 F.3d 708 (1st Cir. 1998) ................................................................................... 14, 17

*Est. of Ungar v. Palestinian Auth.*,
   332 F. App'x 643 (2d Cir. 2009) ...................................................................................16

*Freeman v. HSBC Holdings plc*,
   No. 14-cv-6601-PKC-CLP (E.D.N.Y.) .....................................................................11, 12

*Freeman v. HSBC Holdings plc*,
   No. 18-cv-7359-PKC-CLP (E.D.N.Y.) ............................................................. 11, 12, 13

*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
   333 F.3d 38 (1st Cir. 2003) .......................................................................... 14, 15, 17, 20

*In re TelexFree Sec. Litig.*,
   No. CV 4:14-02566-TSH, 2023 WL 4399987 (D. Mass. June 16, 2023) .......................18

*Lelchook v. Lebanese Canadian Bank, SAL*,
   670 F. Supp. 3d 51 (S.D.N.Y. 2023) ..............................................................................16

*Lelchook v. Société Générale De Banque Au Liban SAL*,
    67 F.4th 69 (2d Cir. 2023) .................................................................. 6

*Liberty Mutual Insurance Co. v. Diamante*,
    194 F.R.D. 20 (D. Mass. 2000) ......................................................... 19

*Licci, et. al. v. American Express Bank Ltd. and Lebanese Canadian Bank SAL*,
    Case No. 1:08-cv-07253 (S.D.N.Y.) ................................................. 2

*Menashe v. Covington & Burling LLP*,
    552 F.Supp.3d 35 (D.D.C. 2021) ...................................................... 16

*Mulvey v. Chrysler Corp.*,
    106 F.R.D. 364 (D.R.I. 1985) ........................................................... 14

*O'Grady v. Safety-Kleen Systems, Inc.*,
    No. 19-cv-11814-ADB, 2021 WL 124442 (D. Mass. Jan. 13, 2021) .............................. 15

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978) .......................................................................... 18

*Podany v. Robertson Stephens, Inc.*,
    350 F. Supp. 2d 375 (S.D.N.Y. 2004) .............................................. 18

*Smith v. Turbocombustor Tech., Inc.*,
    338 F.R.D. 174 (D. Mass. 2021) ....................................................... 13

*Solamere Cap. v. DiMann*o,
    621 F. Supp. 3d 152 (D. Mass. 2022) ............................................... 15

*State of Maine v. U.S. Dept. of Interior*,
    298 F.3d 60 (1st Cir. 2002) ............................................................... 17

*Stephens v. HSBC Holdings plc*,
    No. 18-cv-7439-PKC-CLP (E.D.N.Y.) ............................................ 11

*Twitter v. Taamneh*,
    598 U.S. 471 (2023) ....................................................................... 5, 6

*United Therapeutics Corp. v. Watson Lab'ys, Inc.*,
    200 F. Supp. 3d 272 (D. Mass. 2016) ............................................... 14

*U.S. v. Lebanese Canadian Bank SAL*,
    Case No. 1:11-cv-09186-PAE (S.D.N.Y.) ........................................ 3

**Rules**

Fed. R. Civ. P. 26.................................................................................................*passim*

Fed. R. Civ. P. 45.................................................................................................*passim*

**Other Authorities**

Beirut Bank Seen as a Hub of Hezbollah's Financing (*The New York Times*, Dec. 13, 2011) ....... 3

**Statutes**

18 U.S.C. § 2333 ...................................................................................................... 3

## INTRODUCTION

The instant motion arises from discovery improprieties that border on absurdity. Plaintiffs served a non-party subpoena on Ashcroft, the law firm representing SGBL, a party opponent in active litigation in EDNY, demanding that Ashcroft produce documents from its SGBL client files for use by Plaintiffs in litigation against SGBL. In the process, Plaintiffs' subpoena disregards the discovery limitations established under FRCP 26 and 45, and ignores the scope of relevance, subject matter and temporal limitations imposed by the court in the EDNY Litigation. A review of the procedural landscape in the EDNY Litigation and similar litigation involving Plaintiffs' counsel reveal a pattern of abuse and misuse of discovery. Under Rule 26(c)(1), this Court is empowered to protect "a party or person from annoyance, embarrassment, oppression, or undue burden or expense" caused by the discovery process.

SGBL is a commercial bank headquartered in Beirut, Lebanon. Since April 2011, Ashcroft has served as counsel for SGBL in various legal matters, including the defense of SGBL in the EDNY Litigation since it commenced in 2019. The EDNY court has granted motions to dismiss by SGBL (in full) and the bank defendants (in part) in that case, substantially narrowing the EDNY Litigation to two surviving claims. The EDNY court also issued an order on March 31, 2023 significantly limiting the scope of discovery. As the EDNY Litigation has narrowed, Plaintiffs have embarked on an aggressive campaign of non-party subpoenas in multiple jurisdictions, resulting in collateral acrimony and forcing non-parties like Ashcroft to engage in increasingly farcical litigation.

Plaintiffs' subpoena should be quashed because the materials it seeks (1) were created in the course of Ashcroft's provision of legal advice to and representation of SGBL and are comprised overwhelmingly of non-discoverable privileged communications and attorney work product, (2)

are of at-best minimal relevance to the EDNY Litigation, yet would be highly burdensome to produce, especially in light of Ashcroft's obligation to protect the privileges and confidences of its client, (3) appear to be sought for improper purposes and uses by Plaintiffs' counsel, and (4) to the extent not shielded by legal privilege or consisting of attorney work product, should and could be sought from other readily reachable third parties that are unencumbered by the privilege concerns identified in this Motion.

## I.     RELEVANT FACTUAL BACKGROUND

### A.  Ashcroft's Representation of SGBL from 2011 to the Present

Ashcroft's representation of SGBL began over a decade ago when it began providing legal—not business—advice to SGBL in connection with a potential purchase of certain foreign assets and liabilities. Specifically, on February 10, 2011, the U.S. Department of Treasury ("Treasury") identified Lebanese Canadian Bank ("LCB") as a financial institution of primary money laundering concern under a provision of the Patriot Act. Treasury found LCB provided banking services to Hezbollah members and other illicit enterprises.[1]

In April 2011, with increasing legal and law enforcement pressure rendering LCB unable to continue normal operations, SGBL retained Ashcroft as its legal counsel to advise SGBL in its objective to purchase the *untainted* assets and liabilities of LCB and navigate the potential legal risks involved in the process. The SGBL–Ashcroft engagement stipulated that Ashcroft would retain the consulting services of a separate entity, The Ashcroft Group, LLC ("Group"), to assist Ashcroft on behalf of SGBL with respect to the Patriot Act and interactions with Treasury officials.

The Central Bank proceeded with a competitive sale of certain of LCB's assets and liabilities and SGBL was deemed the highest bidder. In June 2011, SGBL and LCB entered into a

---

[1] Treasury's finding was not the first such allegation involving LCB, which since 2008 had been a defendant in litigation in SDNY. *See Licci, et. al. v. American Express Bank Ltd.*, Case No. 1:08-cv-07253 (S.D.N.Y.).

sale and purchase agreement ("SPA") for $580 million cash subject to final valuation adjustments based upon a rigorous filtering process that sought to eliminate any and all questionable accounts (*e.g.*, those associated with money laundering), and the review and approval of the Central Bank of Lebanon. On September 7, 2011 the Central Bank of Lebanon granted its final approval.[2]

While the transaction was pending, the DOJ sought a civil forfeiture of $150 million in what the Government believed to be LCB assets that were being held in escrow by a third-party financial institution in connection with the asset purchase by SGBL. *U.S. v. Lebanese Canadian Bank SAL*, Case No. 1:11-cv-09186-PAE (S.D.N.Y.). Represented by Ashcroft, SGBL filed a claim as an innocent, lawful owner of a portion of the escrow funds in March 2013. The Government, LCB, and SGBL reached an agreement as to the disposition of LCB's seized funds in June 2013. (*See* Exhibit A to Declaration of Michael J. Sullivan ("Sullivan Decl.") submitted herewith). As noted, Ashcroft served as SGBL's legal counsel throughout the course of SGBL's involvement in the civil forfeiture proceeding.

### B.  Pleadings and Motion Practice in the EDNY Litigation

Plaintiffs in the EDNY Litigation are American nationals who were injured or whose family members were injured or killed by acts of terrorism allegedly perpetrated by Hezbollah in Iraq between 2004 and 2011. Plaintiffs filed the complaint in EDNY on January 1, 2019 alleging violations of the Anti-Terrorism Act, including as amended by the Justice Against Sponsors of Terrorism Act (JASTA), 18 U.S.C. § 2333(a), (d), against 12 of the largest financial institutions in

---

[2] The United States also supported the purchase and based on SGBL's due diligence and commitment to combat money laundering and the financing of terrorist organizations, considered SGBL a "responsible owner." *See* Jo Becker, Beirut Bank Seen as a Hub of Hezbollah's Financing (*The New York Times*, Dec. 13, 2011) available at https://www.nytimes.com/2011/12/14/world/middleeast/beirut-bank-seen-as-a-hub-of-hezbollahs-financing.html. In fact, the compliance process included independent international compliance experts and a parallel auditing proceeding implemented by SGBL that utilized a scoring methodology to screen LCB's accounts, customers, and operations. *Id.*

Lebanon, including SGBL and LCB (collectively "bank defendants"), whom Plaintiffs allege provided support to Hezbollah in the form of financial banking services. (*Bartlett*, ECF No. 1).[3]

Plaintiffs alleged a successor liability theory against SGBL based on SGBL's 2011 acquisition of certain assets and liabilities of LCB. (*Bartlett*, ECF No. 1). As described *supra* at 3–4, SGBL retained Ashcroft to provide legal advice and assistance in connection with the asset-and-liability purchase—a transaction of which Treasury was fully aware and supported. As a basis for their successor liability claim, Plaintiffs alleged that a subsequent audit uncovered LCB accounts with links to Hezbollah and that certain of these accounts later migrated to certain bank defendants in 2011–12. (*Id.*).

Plaintiffs filed an amended complaint on August 2, 2019. (*Bartlett*, ECF No. 105). The bank defendants moved to dismiss for lack of personal jurisdiction and failure to state a claim. The Hon. Carol Bagley Amon denied the motions in part, finding two of Plaintiffs' claims adequately pleaded, namely, aiding-and-abetting and conspiracy under JASTA. *See Bartlett v. Société Générale de Banque au Liban SAL*, No. 19CV00007CBAVMS, 2020 WL 7089448, at *1, 16, n.16, 18 (E.D.N.Y. Nov. 25, 2020) ("*Bartlett I*"). Judge Amon dismissed the successor liability claim finding that Plaintiffs failed to establish a prime facie case of personal jurisdiction over SGBL under a "successor personal liability theory." *Bartlett I*, at *16–17.

Following Judge Amon's ruling in *Bartlett I*, Plaintiffs on December 31, 2020 filed a second amended complaint spanning 837 pages. (*See Bartlett*, ECF No. 189, Second Amended Complaint ("SAC")).  Defendants then filed a second round of motions to dismiss, and on June 17, 2022, Judge Amon issued a decision reaffirming her previous determination in *Bartlett I* that

---

[3] To reduce potential confusion in citations to filings in other cases, this Motion will include an italicized shorthand reference to the relevant case with each citation to a specific ECF docket number.

4

Plaintiffs may proceed on their two JASTA claims brought under theories of aiding-and-abetting and conspiracy liability. (*See Bartlett*, ECF No. 291 (unpublished order)).

Defendants served answers to the SAC in September 2022, (*Bartlett*, ECF Nos. 301–312), after which followed a number of discovery-related filings, discussed further below.  On October 20, 2023, following the Supreme Court's opinion in a key ATA pleading case, *Twitter v. Taamneh*, 598 U.S. 471, 502 (2023), Plaintiffs filed a Third Amended Compliant ("TAC"), along with a motion to have the entire TAC filed and maintained under seal. (*Bartlett*, ECF No. 353). Magistrate Judge Taryn Merkl denied the motion and directed Plaintiffs to refile the motion with "a cover letter explaining which redactions they seek and why, and a proposed redacted version of the documents on the public docket." (*Bartlett*, Minute Entry Order, Oct. 25, 2023).

On November 7, 2023, Plaintiffs filed a motion for leave to file their TAC under seal *in its entirety*, seeking to seal information obtained in discovery that was designated as confidential under the Protective Order governs the EDNY Litigation. (*See Bartlett*, ECF Nos. 359–360 and 362 (TAC); *see generally* Protective Order, ECF No. 273). The following day, Judge Amon ordered Plaintiffs to file a redlined version of their TAC and provide "an explanation for why the Complaint is 85 additional pages as opposed to the anticipated 30 pages that Plaintiffs represented to the Court." (*Bartlett*, Minute Entry Order, Nov. 8, 2023).

After receiving Plaintiffs' proposed redactions to the TAC, on May 23, 2024, Judge Merkl issued an order granting in part and denying in part Plaintiffs' motion to seal the TAC. (*Bartlett*, ECF No. 395). Judge Merkl's order observed: "Interestingly, the TAC represents that the newly-added allegations are not based on discovery received from Defendants." (*Id.* at 5). Judge Merkl further noted that "[t]he TAC does not specify the source of the information underlying the allegations proposed to be filed under seal." (*Id.*). Finding a substantial majority of Plaintiffs'

proposed redactions unwarranted, Judge Merkl concluded that Plaintiffs may publicly file the TAC "with the very limited redactions authorized herein" no later than June 20, 2024. (*Id.* at 13).

Meanwhile, on March 15, 2024, defendants filed a motion to dismiss the TAC based upon the new pleading standard articulated in *Taamneh*, 598 U.S. at 502, (*Bartlett*, ECF No. 377). For their part, Plaintiffs have argued that Judge Amon should revisit her ruling that the court lacked personal jurisdiction over SGBL based upon a new opinion by the New York Court of Appeals.[4] Briefing is complete, and the parties currently are awaiting Judge Amon's decision.

### C. Discovery in EDNY Litigation

Discovery in the EDNY Litigation commenced in 2021 after Plaintiffs moved to start discovery despite the fact that the parties were, at that time, awaiting Judge Amon's decision on the second round of motions to dismiss. *Bartlett I*, at *3. The EDNY court issued orders for party discovery, third-party subpoenas, and motion practice for discovery disputes. *See id*. The parties thereafter filed the discovery-related motions, which were decided by Judge Merkl on March 31, 2023. *Bartlett v. Societe Generale de Banque au Liban SAL*, No. 19-CV-7, 2023 WL 2734641, at *7 (E.D.N.Y. Mar. 31, 2023) ("*Bartlett Discovery Order*").

Judge Merkl's Order observed that "the central allegations in the case concern Defendants' provision of financial services to individuals and entities associated with Hezbollah" and therefore "bank account records, transactional records, compliance records, and internal and external communications regarding persons and entities associated with Hezbollah are undoubtedly relevant, as would be documents that provide 'direct evidence of a bank's subjective awareness of

---

[4] That state court opinion came as a result of a certified question by the Second Circuit on an issue of state law. *See Lelchook v. Société Générale De Banque Au Liban SAL*, 67 F.4th 69, 82 (2d Cir. 2023)). Plaintiffs' "successor personal jurisdiction theory," including whether such a theory comports with constitutional due process, remains before the Second Circuit. *Lelchook v. SGBL*, No. 21-975.

its role in terrorist attacks — internal memoranda, e-mails, and the like.'" *Bartlett Discovery Order*, 2023 WL 2734641, at *7 (quoting *Bartlett I*, at *10).

Against the foregoing relevance definition, Judge Merkl found Plaintiffs' requests to be "too broad" in subject matter and temporal scope, and therefore limited discovery in the EDNY Litigation to include only the following: (1) records related to the 592 individuals and entities specifically identified in Plaintiffs' SAC for the time period January 1, 2003 through November 30, 2011; and (2) records related to the individuals and entities identified in Exhibit 2 of Plaintiffs' SAC for the time period January 1, 2012 through December 31, 2012. *Bartlett Discovery Order*, at *8; *see also id.* at *16 n.24 (rejecting "Plaintiffs' blunderbuss approach of seeking records pertaining to all 687 persons or entities from all eleven moving Defendants").

In addressing defendants' objections based on disclosure prohibitions in Lebanon's Bank Secrecy Law, Judge Merkl stated that "the Court has scope and proportionality concerns, particularly in light of the comity analysis that the Court must undertake[.]" *Bartlett Discovery Order*, 2023 WL 2734641, at *9. After conducting the balancing analysis and concluding that defendants' foreign bank secrecy objections were overruled, Judge Merkl nevertheless agreed that international comity weighed in favor of allowing defendants the opportunity to seek permission from the relevant Lebanese authorities via Letter Rogatory before producing discovery in violation of Lebanon's Bank Secrecy Law. *Id.* at *15. The current deadline for defendants to submit Lebanese authorities' response is July 15, 2024. (*Bartlett*, ECF No. 391).

Notably, Judge Merkl's Discovery Order did not mention the Treasury's designation of LCB as a "financial institution of primary money laundering concern" in its discussion of the scope of relevant discovery. Nor did it make any reference to Plaintiffs' requests "concerning the migration of LCB account balances and customers to SGBL or other Defendants".

### D.  Plaintiffs' Subpoenas to Non-Party Ashcroft

On April 25, 2024, Plaintiffs served their Rule 45 Subpoena on Ashcroft. (*See* Sullivan Decl. Ex. B). Plaintiffs' Subpoena instructions blatantly disregard the discovery limitations imposed by Judge Merkl's March 31, 2023 Order, asserting that "[t]he relevant time period with respect to each Document Request herein is February 17, 2011, to the present." (*Id*. at 2; *cf. Bartlett Discovery Order*, 2023 WL 2734641, at *8).

Plaintiffs' Subpoena proceeds to make 29 requests for production of documents, most of which are patently overbroad demands for "all" documents in categories that ignore the relevance constraints imposed by the Bartlett Discovery Order. For example, Request No. 3 seeks "All non-privileged Documents and Communications Concerning SGBL's acquisition of LCB." (*Id*. at 5).

Notwithstanding the perfunctory "non-privileged" qualifier, Plaintiffs' requests attempt to directly invade the attorney-client relationship—for example, Request No. 6 seeks "All non-privileged Documents and Communications forming the basis of John Ashcroft's legal representatives' statement to *The New York Times* that 'all the problematic accounts had been excised, even though it meant losing nearly $30 million a year in interest and fees.'" (*Id*. at 5).

Elsewhere Plaintiffs' Subpoena demands "All Communications" between Ashcroft and Treasury, the Department of Justice ("DOJ") , the Drug Enforcement Agency ("DEA"), as well various entities in Lebanon "Concerning SGBL's acquisition of LCB", despite the complete lack of relevance any such communications might have with respect to the surviving claims in the EDNY Litigation and limitations on discovery imposed by the Bartlett Discovery Order. (*See id*. at 5–7, Request Nos. 7–28).

Further distancing itself from FRCP 26 and 45, the Subpoena demands that Ashcroft produce "all communications" between the above government agencies and The Ashcroft Group,

LLC ("Group"), another non-party that is wholly distinct from Ashcroft. Plaintiffs' demands for Ashcroft to produce discovery on behalf of separate non-party is a continuation of Plaintiffs' abusive discovery tactic of targeting non-parties that share the *Ashcroft* name but are not the Ashcroft Law Firm and have nothing to do with the EDNY Litigation, as discussed below.

### E.  Plaintiffs' Abusive Discovery Efforts Against Non-Parties

On July 22, 2022, Plaintiffs' counsel attempted to issue a subpoena substantially identical to the one issued to Ashcroft on TAG Holdings, LLC ("TAG") in Arlington, Virginia apparently based on the erroneous belief that Holdings is synonymous with Group. However, TAG is entirely distinct from Group, had nothing to do with SGBL, and as of July 2022 had no presence in Virginia outside of rented mailbox from a UPS store in Arlington, Virginia. Nevertheless, Plaintiffs claimed to have properly served TAG through an employee at the aforementioned UPS store in Arlington— an individual who was clearly not an employee or agent of TAG or Group and certainly was not authorized to accept service for TAG or Group.

Plaintiffs' defective service of non-party TAG and their misdirected subpoena led to contentious proceedings in the District Court for the District of Columbia, *Bartlett, et al. v. TAG Holdings, LLC*, Case No. 1:22-mc-00130 (D.D.C.). The DDC court initially faulted TAG for failing to timely respond to Plaintiffs' subpoena and entered several orders adverse to TAG, including an order granting a motion for contempt.

However, on February 15, 2024, the DDC court held that without proof of actual service of the Rule 45 subpoena, "the Court [could not] subject TAG, a non-party, to civil contempt sanctions." (*Tag Holdings*, ECF No. 26, Transcript of Oral Ruling dated Feb. 15, 2024 at p. 9:9-11). The DDC court vacated its adverse-to-TAG orders and denied Plaintiffs' motion for judgment

of accrued sanctions on the same basis. (*Id.* at p. 13:20-22). The court did find that TAG was compelled to respond to the subpoena.

On March 15, 2024, TAG served its responses and objections to Plaintiffs' subpoena in which TAG reiterated it did not have any documents responsive to the subpoena. Responding further, TAG repeated it was separate and legally distinct from the Group, and therefore it could not produce documents in the possession of the Group as requested by the subpoena. Frustrated by their own error, namely issuing a subpoena to the wrong entity from the start, Plaintiffs refused to accept TAG's responses and demanded that TAG produce documents in possession of the Group.

On April 11, 2024, the DDC court found that TAG properly responded to the subpoena and was not obligated to produce documents in the possession of the Group. (*See Tag Holdings*, ECF No. 29, Transcript of Oral Ruling dated April 11, 2024 at p. 11:15-24). The court declined Plaintiffs' remaining requests for relief and having resolved the issues giving rise to the miscellaneous action, the court informed the parties the case "was over." (*See id.* at p. 12:2-3).

Nevertheless, Plaintiffs' counsel requested that the DDC court keep the matter open so that they may file a motion for fees and costs. The court agreed and Plaintiffs, despite their meager success, filed a motion seeking to recover a panoply of excessive fees and costs, in the amount of $74,147.69 not only from TAG but astonishingly from Ashcroft as well.[5] TAG filed its opposition on May 9, 2024 and Plaintiffs filed their reply on May 23, 2024. The parties currently are awaiting the DDC court's decision on the fees motion.

### F.  Plaintiffs' Attempt to Misuse Discovery Obtained in EDNY Litigation

---

[5] Plaintiffs' motion seeks service fees for four defective service attempts, inflated billing entries from four partners, one senior counsel, and one counsel level attorney, 78.25 hours in fees for motions on which Plaintiffs were ultimately unsuccessful, and a whopping 43.75 hours to prepare the fee motion itself. (*See Tag Holdings*, ECF No. 30).

Plaintiffs' pursuit of discovery from another non-party in the EDNY Litigation provides an additional concrete example of the abusive, improper purposes of Plaintiffs' Subpoena to Ashcroft.

On December 27, 2021, Plaintiffs issued a 33-page subpoena to non-party Standard Chartered Bank ("SCB") for banking records concerning 682 persons and entities purportedly relevant to the allegations in this case. (*Bartlett*, ECF No. 339-1). After significant negotiations, SCB agreed to search for transaction records referencing the names that Plaintiffs identified, but only upon entry of suitable protective order limiting their subsequent use outside of the EDNY Litigation. (*Id.*, ECF No. 339-2, at 2). Plaintiffs agreed to that condition, negotiated the Protective Order with defendants, and reported to SCB when it was entered by the Court. SCB then produced more than 50,000 transaction records in reliance on the Protective Order.

However, once SCB's records were in hand, Plaintiffs filed a motion in the EDNY Litigation seeking permission to ignore the Protective Order and use SCB's confidential records to try to revive already dismissed complaints against SCB in a separate set of lawsuits (the "*Freeman* actions") where no discovery was ever authorized.[6] Abandoning the positions taken in negotiations with SCB earlier, Plaintiffs argued that the Protective Order never actually protected SCB's records in the first place, or if it did protect them, those protections should be cast aside.

Judge Merkl rightly rejected Plaintiffs' efforts to disavow their freely negotiated Protective Order. (*See Bartlett*, ECF No. 348-1 at 57:4-19, 60:8-13). Judge Merkl likewise found no

---

[6] The *Freeman* actions include: *Freeman v. HSBC Holdings plc*, No. 14-cv-6601-PKC-CLP (E.D.N.Y.) ("*Freeman I*"); *Freeman v. HSBC Holdings plc*, No. 18-cv-7359-PKC-CLP (E.D.N.Y.) ("*Freeman II*"); and *Bowman v. HSBC Holdings plc*, No. 19-cv-2146-PKC-CLP (E.D.N.Y.), which has been consolidated with *Freeman II*. There is also a fourth case, *Stephens v. HSBC Holdings plc*, No. 18-cv-7439-PKC-CLP (E.D.N.Y.), and Plaintiffs seek to share SCB's confidential banking records with counsel for the *Stephens* plaintiffs as well.

justification for allowing Plaintiffs to use unspecified information from SCB's records to try to draft an amended complaint in another action. (*Bartlett*, ECF No. 348-1 at 11:4-10, 60:14-24).[7]

Plaintiffs appealed that decision to Judge Amon, who affirmed on December 21, 2023. (*Bartlett*, ECF No. 368). Judge Amon recognized that "the *Freeman* plaintiffs [were] seeking to use the discovery in *Bartlett* to revive a case where they ha[d] been denied discovery to support a proposed amended complaint," and held that the Protective Order precluded that use. (*Id*. at 10). Judge Amon further emphasized that "the prejudice of using SCB's third-party disclosures in *Bartlett* to establish a cause of action against SCB in another case is apparent." (*Id*. at 11).

Ignoring Judge Merkl's and Judge Amon's orders, the *Freeman II* plaintiffs used SCB's confidential information in drafting a 704-page second amended complaint and promptly after losing their appeal to Judge Amon filed said SAC with 47 pages of redacted allegations that those plaintiffs admit were "sourced from" the confidential banking records that SCB and another non-party had produced to Plaintiffs in the EDNY Litigation. (*Freeman II*, ECF No. 117, at 3 n.5).[8]

The *Freeman II* plaintiffs and their counsel from the Osen Firm have now sought discovery from SCB of the records SCB produced in the EDNY Litigation case in order to unmask their proposed SAC in the *Freeman II*. (*Freeman II*, ECF No. 120 at 1). The *Freeman II* plaintiffs argued that Plaintiffs have not violated the Protective Order by using the *Bartlett* discovery outside of the EDNY Litigation because they did not publicly disclose the specific contents of the protected documents. (*See id*. at 1 n.1; *Freeman II*, ECF No. 124 at 1).

---

[7] In May 2024, Plaintiffs' counsel, Osen LLC, represented to the DDC court that the Osen firm "currently has ten pending cases commenced under the ATA, including as amended by JASTA, or under JASTA." (*Tag Holdings*, ECF No. 30-1, Affidavit of Michael Radine dated April 18, 2024, at ¶ 4).

[8] The *Freeman II* plaintiffs also purported to describe those records with the self-serving characterization as "highly relevant records" that "provide additional evidence that some of the Defendants knowingly provided substantial assistance to the IRGC and Hezbollah." (*Freeman II*, ECF No. 117, at 3 n.5).

On February 5, 2024, the court permitted the *Freeman II* plaintiffs to provisionally serve a discovery request on SCB and set a briefing schedule for SCB to oppose that request. (*Freeman II*, Minute Entry dated Feb. 6, 2024). The court also invited SCB to file a letter in the EDNY Litigation seeking confirmation that Plaintiffs' use of SCB's records in *Freeman II* constitutes a prohibited "use" under the Protective Order. (*Freeman II*, Feb. 5, 2024 Conference Transcript at 24:10–21.) In so doing, the court indicated that a determination from the EDNY will serve as the final word on the proper scope of the Protective Order with regard to the *Freeman II* plaintiffs' use of confidential discovery in *Bartlett*.[9]

\* \* \*

In summary, Plaintiffs' actions in discovery to date demonstrate opportunistic indifference to the Rules, voluntarily negotiated Protective Orders, and Judge Merkl's orders governing discovery in the EDNY Litigation. This pattern of abusive and improper discovery undermines any notion that Plaintiffs' subpoena of non-party Ashcroft was issued for a proper purpose. Nor is there any evidence to suggest that Plaintiffs' counsel should be given the benefit of the doubt when it comes to negotiating in good faith. Unsurprisingly, the meet-and-confer conference call and follow-on email exchange between counsel for Ashcroft and Plaintiffs conducted prior to the instant motion were largely unconstructive and did not resolve the issues in dispute.

## II.    ARGUMENT

"A Rule 45 subpoena must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1). Thus, the information sought must be: (1) not privileged; (2) relevant to the claim or

---

[9] Further demonstrating sheer indifference to the unsettled discovery matters then being addressed in *Freeman II* and the EDNY Litigation, Plaintiffs' counsel on February 26, 2024, filed a motion to vacate the final judgment of dismissal in *Freeman I* on behalf of yet another set of plaintiffs—several hundred of whom had no involvement in *Bartlett*— and purported to describe the substance of the *Bartlett*-derived and redacted *Freeman II* SAC allegations. (*See Freeman I*, ECF No. 277-1 at 23).

defense of any party; and (3) proportional to the needs of the case." *Smith v. Turbocombustor Tech., Inc.*, 338 F.R.D. 174, 176 (D. Mass. 2021) (citation omitted). Under Rule 26(b)(2), "the court must limit the frequency or extent of discovery . . . if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." *See also Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985). It also requires that discovery be limited if the burden or expense of such discovery outweighs its probable benefits. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

The Rule 26 analysis changes when applied to non-parties. As the First Circuit has explained, "parties to a law suit must accept [the invasiveness of discovery] as natural and concomitant of modern civil litigation," but "[n]on-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight[.]" *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (finding that district court "balanced the right array of factors" and acted within its discretion when it denied Microsoft's motion to compel a third party to produce documents).

Indeed, "the scope of discovery *differs significantly* between parties and non-parties." *Bio-Vita, Ltd. v. Biopure Corp.*, 138 F.R.D. 13, 17 (D. Mass. 1991) (denying a request for a visit to the site of a non-party's operations) (emphasis supplied). The broad, historical relevance standard under Fed. R. Civ. P. 26(b) "does not apply to non-parties." *Id*. The scope of permissible non-party discovery is instead conditioned on a "stronger showing of relevance" as well as a "necessity restriction" that is weighed against "the non-party's interest in non-disclosure." *Id*. (internal quotations omitted); *see also United Therapeutics Corp. v. Watson Lab'ys, Inc.,* 200 F. Supp. 3d 272, 277 (D. Mass. 2016) ("When it comes to assessing burden, courts are generally more solicitous of non-parties."). Rule 45 requires courts to "quash or modify a subpoena if the subpoena

'subjects a person to undue burden.'" *Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003) (affirming district court's quashing of third-party subpoena).

Among the factors courts consider in deciding motions to quash are: "whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, nonprivileged, and crucial to the moving party's case." *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003). Courts in this Circuit routinely apply these principles to protect non-parties like Ashcroft from burdensome or abusive discovery by granting motions to quash. *See, e.g.*, *Heidelberg*, 333 F.3d at 41–42 (affirming district court's decision granting motion to quash non-party subpoena); *Cusamano*, 162 F.3d at 717 (affirming district court's decision denying non-party discovery); *Solamere Cap. v. DiMann*o, 621 F. Supp. 3d 152, 161 (D. Mass. 2022) (finding the burden on non-party to produce even limited discovery outweighs its likely benefit under Rule 26(b)(1) and granting motion to quash). The same result is required here.

### E. Plaintiffs' Subpoena Must Be Quashed Because It Is Overbroad and Subjects Non-Party Ashcroft to an Undue Burden

Plaintiffs' Subpoena should be quashed because it is grossly overbroad and requests irrelevant information. Plaintiffs have made no effort to tailor the subpoena to the claims in the EDNY Litigation or adhere to the relevance criteria and temporal limitations specified in Judge Merkl's March 31, 2023 Order.  Judge Merkl's Order limited discovery to:

(1) records related to the 592 individuals and entities **specifically identified** in Plaintiffs' SAC for **the time period January 1, 2003 through November 30, 2011**; and

(2) records related to the individuals and entities **identified in Exhibit 2** of Plaintiffs' SAC for **the time period January 1, 2012 through December 31, 2012**.

*Bartlett Discovery Order*, 2023 WL 2734641, at *8 (emphasis added).  In contrast, Plaintiffs' Subpoena claims that "[t]he relevant time period with respect to each Document Request herein is

**February 17, 2011, to the present**", (Sullivan Decl. Ex. B at 2), and makes sweeping requests for "all" documents without specifying any particular individual or entity identified in the SAC or accompanying Exhibit 2. *See O'Grady v. Safety-Kleen Systems, Inc.*, No. 19-cv-11814-ADB, 2021 WL 124442, at *4 (D. Mass. Jan. 13, 2021) (refusing to compel discovery requests that disregarded relevant temporal scope and simply sought "all information from 2015 through the present").

Instead, for example, Plaintiffs request "All non-privileged Documents and Communications Concerning SGBL's acquisition of LCB", (Request No. 3), and "all Transactional Records identified by You, The Ashcroft Group, LLC, LCB, SGBL or any other person or entity Concerning Hezbollah or Hezbollah-affiliated persons or entities." (Request No. 19). These types of requests—seeking "all" documents using unfocused, generalized categories like "Concerning Hezbollah" or so-called "Hezbollah-affiliated persons or entities"—are overbroad and improper on their face. *See Lelchook v. Lebanese Canadian Bank, SAL*, 670 F. Supp. 3d 51, 55 (S.D.N.Y. 2023) (finding request seeking "all" documents ever acquired by law firm in representing non-party related to "Relevant Persons" was "presumptively overbroad and improper" and granting motion to quash). Like the plaintiffs in *Lelchook*, the Plaintiffs' Subpoena fails to demonstrate any effort to limit the requests to information relevant to the claims and defenses and proportional to the needs of the EDNY Litigation or the limitations set by Judge Merkl's Discovery Order.[10]

Even if it were proper to seek documents from Ashcroft, the subpoena should be quashed because it is unduly burdensome. Indeed, a subpoena that demands that a law firm produce its client file, the majority of which is protected by attorney-client privilege or the work-product doctrine, is *per se* burdensome. *See Est. of Ungar v. Palestinian Auth.*, 332 F. App'x 643, 645 (2d Cir. 2009) (affirming order quashing subpoena "which asked for essentially every document [law

---

[10] *See* Chart of Subpoena Requests and Ashcroft's Objections attached as Exhibit C to Sullivan Decl.

firm] possessed relating to its representation of [a client] all over the world—because it was overly broad and burdensome"); *Menashe v. Covington & Burling LLP*, 552 F.Supp.3d 35, 44 (D.D.C. 2021) ("Separating protected documents, including most if not all of the analyses and communications, from those not subject to privilege and work product would require a painstaking document-by-document review of all the information in Covington's client file[.]").

Throughout Ashcroft's representation of SGBL, litigation has been a foreseeable prospect and a concrete reality. As such, Ashcroft's potentially responsive files consist overwhelmingly of attorney-client privileged or otherwise protected work product. Most, if not all, of the documents prepared in the period leading up to and during the LCB asset and liability purchase are protected work product. The work-product doctrine "protects from disclosure materials prepared by attorneys 'in anticipation of litigation," and is codified in Fed. R. Civ. P. 26(b)(3). *State of Maine v. U.S. Dept. of Interior*, 298 F.3d 60, 66 (1st Cir. 2002); *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 139 F.R.D. 269, 274–75 (D. Mass. 1991) ("The work product doctrine is distinct from and broader than the attorney-client privilege."). Likewise, the years of communications between Ashcroft and SGBL are likely to be overwhelmingly protected by the attorney-client privilege and contain significant amounts of protected attorney work product. These documents comprise the vast majority of the files that Ashcroft would need to review in order to produce documents responsive to Plaintiffs' Subpoena.

Courts must balance a party's need for discovery against the potential hardship the requests would impose on others—especially non-parties. *See Cusumano*, 162 F.3d at 717 (burden thrust upon non-parties "is a factor entitled to special weight in evaluating the balance of competing needs"). Separating protected documents from those not subject to any privilege, protection, doctrine, or objection would require a painstaking document-by-document review of all the

information that Ashcroft has in its possession regarding its representation and advocacy of SGBL over the past 13 years. Further, as described above, that process would not result in the identification of documents for which Plaintiffs have a significant need. *See Heidelberg*, 333 F.3d at 41-42 (upholding the district court's decision to quash a subpoena directed to a third party and emphasizing that "a litigant may not engage in merely speculative inquiries in the guise of relevant discovery") (internal quotes omitted).

Plaintiffs' subpoena is overbroad on its face, disregards the governing Discovery Order, seeks "disclosure of privileged or other protected matter", and subjects Ashcroft to an undue burden contrary to Rules 26 and 45. For these reasons, Ashcroft requests that this Court, consistent with its authority and obligations under Rule 45(d), quash Plaintiffs' subpoena.

### F.   The Subpoena Must Be Quashed Because It Was Issued for an Improper Purpose

Plaintiffs have no genuine need to obtain the subpoenaed information from Ashcroft. Against the backdrop of Plaintiffs' counsel's repeated misuse of non-party discovery in the EDNY Litigation and separate cases, described *supra* at 9–14, Plaintiffs' true purposes in subpoenaing Ashcroft appears to be harassment and disruption of its defense of SGBL and pursuit of confidential information learned in one case to try to revive dismissed claims in other cases.

The nature of Plaintiffs' Subpoena to Ashcroft and the discovery tactics used by Plaintiffs' counsel against other non-parties in similar cases strongly suggests purposes that are blatantly contrary to the fundamental principles governing discovery in civil litigation in federal courts. *See In re TelexFree Sec. Litig.*, No. CV 4:14-02566-TSH, 2023 WL 4399987, at *2 (D. Mass. June 16, 2023) (finding improper motivation where plaintiffs requested "what is essentially party discovery on a non-party in a bid to revive claims that were not sufficiently pleaded" and noting that court was "'not required to blind itself to the purpose for which a party seeks information'") (quoting

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978)); *see also Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) ("discovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to … salvage a lawsuit that has already been dismissed for failure to state a claim" ).

Rule 26 allows courts to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." *See* Fed. R. Civ. P. 26(c)(1); *see also Liberty Mutual Insurance Co. v. Diamante*, 194 F.R.D. 20, 22 (D. Mass. 2000) (quashing non-party subpoena issued for the improper purpose of inducing party to comply with previously issued subpoenas). It is eminently reasonable to conclude that Plaintiffs' subpoena to Ashcroft was issued for the improper purposes of obtaining and misusing confidential discovery to advance other cases and to harass the law firm and interfere with its representation of SGBL. Plaintiffs' subpoena, therefore, should be quashed pursuant to Rules 26 and 45.

### G. The Subpoena Must Be Quashed Because It Seeks Information That Can Be Requested from the Relevant Governmental Entities or Parties

Plaintiffs' attempt to obtain LCB-related records from Ashcroft should be rejected for a another, independent reason: Plaintiffs should obtain those documents from LCB, which is a party to the EDNY Litigation, and not from the privileged client files of a party opponent's law firm. Rule 26(b)(2) requires this Court to limit discovery where it "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2). Nothing prohibits Plaintiffs from submitting FOIA requests to Treasury, DEA, and DOJ seeking communications related to the LCB–SGBL transaction without the complications inherent in seeking discovery of a law firm's client files which are fundamentally confidential in nature and subject to attorney-client privilege, work-product doctrine protections and the firm's obligations to prevent improper disclosure on any applicable basis.

### H.  Ashcroft Should Recover Its Attorney's Fees

Ashcroft should recover attorney's fees reasonably incurred in responding to Plaintiffs' improper subpoena. Where the issuing party fails to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena[,] [t]he court for the district where compliance is required <u>must</u> enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1) (emphasis added). An award of fees is justified where a party serves an "exceedingly overbroad" subpoena on a nonparty, especially when it encompasses documents that could have been sought from a party first.

### *Conclusion*

Rule 26(c) provides that, upon a showing of good cause, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense," Fed. R. Civ. P. 26(c), and "[e]ven more pertinently, Fed. R. Civ. P. 45(c)(3)(A)(iv) commands that a court 'shall' quash or modify a subpoena if the subpoena 'subjects a person to undue burden.'" *Heidelberg*, 333 F.3d at 41. Ashcroft has made the required showing and respectfully requests that the Court grant its motion to quash and issue a protective order to prevent Plaintiffs' from seeking improper discovery from Ashcroft.

Respectfully submitted,

/s/ *Michael J. Sullivan*
Michael J. Sullivan
Ashcroft Law Firm, LLC
200 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-9400
msullivan@ashcroftlawfirm.com

**Counsel for the Ashcroft Law Firm, LLC and**
**Société Générale de Banque au Liban SAL**

## Meet-and-Confer Compliance Certificate

On Friday, May 24, 2024, counsel for the parties engaged in a meet-and-confer telephone call with regarding the Subpoena giving rise to the instant motion.  During the call, movant's counsel presented their principal concerns and objections to the Subpoena, namely, that it was served on a law firm currently representing a party opponent in litigation and appears to be issued for improper purposes, including to potentially harass movant, and was grossly overburdensome, both on relevance grounds and because it would require movant to sift through its client files consisting of privileged materials and attorney work product seeking information with no relevance to the litigation. Movant's counsel informed opposing counsel that movant intended to move to quash if the Subpoena was not voluntarily withdrawn. Opposing counsel indicated it would not be withdrawn or narrowed unless movant first waived its objections. An email exchange followed the telephone conference but did not result in a resolution.


*/s/Michael J. Sullivan*
Michael J. Sullivan

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2024, I caused the foregoing document to be electronically filed through this Court's CM/ECF system. A copy of the foregoing will be delivered via electronic mail to parties not registered for CM/ECF service.

*/s/Michael J. Sullivan*
Michael J. Sullivan
